THE UNION PACIFIC RAILWAY COMPANY v. ELIZABETH GEARY, *as Administratrix of the estate of Jeremiah Geary, deceased.*

1. EMPLOYÉ, *Killed—Contributory Negligence—Question for Jury.* Where a section man engaged in repairing a railroad track climbs on a car loaded with ties, in a train having a caboose attached, which ties are to be distributed by himself and other track repairers along the railroad; and where it is the custom for such employés to ride on cars loaded with ties, and such section man is killed by being thrown from the car, while in a standing position, by the train suddenly starting without any usual signal, as the ringing of the bell or the sounding of the whistle; and where his foreman saw him in such position before he directed the conductor to start the train, and the conductor also saw him in the same position before motioning with his hand for the engineer to go on: *Held,* That it was a question for the jury to determine, whether, upon all the facts disclosed in the case, the section man was guilty of such contributory negligence as to prevent any recovery, under § 422 of the civil code, if killed.

2. ——— *Conflicting Evidence—Findings.* Where there is conflicting evidence upon the issues of a case, the findings of the jury are conclusive, if supported by positive evidence.

3. EVIDENCE *Sustains Judgment.* All of the evidence examined in this case, and *held* sufficient, as against a demurrer thereto, and *held,* also sufficient to sustain the judgment.

*Error from Ellsworth District Court.*

AUGUST 11, 1888, Jeremiah Geary, who was and had been in the employ for many years as a track repairer or section hand, was killed by being run over by a train of cars of the Union Pacific Railway Company. He left a widow and five children. Geary, at the time of his death, was 39 years old, a healthy man, sober and industrious, and, as such track repairer, was earning $1.25 per day, with which he supported his family. About 2 P. M. of August 11, 1888, Geary, as one of a gang of track repairers composed of Mike Hines, Dan. Yordy, Harry McGuire, and Geary, and under Section Foreman Joe Rabas, was engaged in repairing the track of the Union Pacific railroad, at a point about one mile east of Mt. Zion, in Ellsworth county. There was a wagon crossing known as the "Henderson crossing" near Clear creek. The men were along the road as follows: Rabas, Hines and Yordy were on the north side of the track at the Henderson crossing; McGuire and Geary were on the south side of the track east of the crossing, Geary being three rails, or 90 feet, east of the crossing, and one rail east of McGuire. The evening previous, Rabas had received orders that a car of ties for use on his section was coming, but just when he did not know. The section men were not informed of the coming of the ties, but all knew ties were needed, and that they were needed where they were working at the time of the injury to Geary, and did not know the ties were to be unloaded elsewhere until told by Rabas. There was no evidence that Rabas informed the men, or any of them, where the ties were to be unloaded until after the death of Geary. Beginning just west of this Henderson crossing, the track was on a high fill or dump extending back about 3,000 feet, gradually getting higher and the sides of the dump becoming steeper, to the culvert near the center, where it was about 20 feet high. The top of the dump was about eight inches wider than the ties. Along where the injury occurred, the slope or angle of the dump was 45 degrees. A man going along the side of the

dump had to watch where he went or he would fall.   From the Henderson crossing west, the track of the railroad rises with a heavy grade, extending back to Mt. Zion, a mile to the west.

About 2 o'clock in the afternoon of the 11th day of August, 1888, a freight train consisting of 18 or 19 cars approached the foreman and his trackmen from the west.    A long whistle was sounded.    No other signal was given at the time.   The fireman was on the north side of the engine cab, and the engineer was on the south side.    As the engine passed Rabas, the foreman, the fireman called out of the engine, "we should go back."    This was to Rabas, who then called to the men, "that they should go back toward the caboose."    Geary was on the opposite side of the track, three rails' length — about 90 feet — east of Rabas, and the moving train was between them.    It was not shown that Geary heard Rabas's direction.   As the train passed Geary and McGuire, the engineer called to McGuire, "Harry, get on the train; there is a car load of ties to be distributed."    Delaney, the head brakeman, as he passed Geary and McGuire, testified: "I told them we had a car of ties to unload."    Immediately the men, with whatever speed they could, began making their way along the side of the dump toward the rear of the train.   The ties were back in the train, toward the caboose.    The men hastened toward the rear of the train, which was still moving slowly, and checking up under brakes.    The conductor was on the front platform of the caboose.    Rabas testified: "That they [meaning himself and men] went trotting.    As soon as he got to the caboose, he jumped on the step and went up and spoke to the conductor as soon as he got to him."    Three of the section men also got on the caboose.    Geary did not go clear back to the caboose, but climbed upon the third car from the caboose, and passed from that back to a car of ties, which was the second one from the caboose.    The conductor asked Rabas "if the men were all on."    Rabas looked and saw his men on the platform of the caboose and Geary on the car with the ties, and then he said, "they were all on."    The

conductor then made a motion with his hand to the engineer, and the train started. At the time of giving the motion to go ahead, the conductor saw Geary standing on the car of ties. As soon as the train started, there was a jerk of the cars, and Geary was thrown, or fell, between the cars. Then his body rolled away from the train, and one leg was left between the tracks under the cars.

On the 22d day of June, 1889, Mrs. Elizabeth Geary, the administratrix of the estate of Jeremiah Geary, deceased, commenced her action against the Union Pacific Railway Company, to recover $10,000, alleging that the death of her husband was caused as follows:

"That he, the said Jeremiah Geary, being employed by said defendant as a track repairer, and, in pursuance of his duties in that behalf, got upon one of the cars of defendant for the purpose of unloading certain ties thereupon, said ties being designed for present use in repairing defendant's track a short distance east of the place where said Jeremiah Geary got upon said train; that the said train of cars being then and there operated by said defendant, its agents, servants, and employés; that while the said Jeremiah Geary was upon said car as aforesaid, by the gross negligence, carelessness, wrongful act, neglect, omission and default of the agents, engineers and superintendents of said defendant, while concerned in managing and conducting the business of said defendant, in the operating of said train of cars of defendant, and in causing said train of cars to be suddenly started, with a violent and unusual jerk or motion, and without giving any signal or warning of the intended movement of said cars, he, the said Jeremiah Geary, was, in consequence thereof, thrown from the car he was on and bruised and mangled by the cars of defendant, so that he, at the date aforesaid, died from the injuries then and there received as aforesaid."

Upon the trial, at the January term of court for 1890, the jury returned a verdict for Mrs. Elizabeth Geary, administratrix, and against the Union Pacific Railway Company, for $4,500. Judgment was rendered thereon, and the railway company brings the case here.

*A. L. Williams, N. H. Loomis,* and *R. W. Blair,* for plaintiff in error:

The demurrer to the evidence should have been sustained. The only allegation of negligence in the petition is "in causing said train of cars to be suddenly started, with a violent and unusual jerk or motion, and without giving any signal or warning of the intended movement of said cars." Geary knew, or should have known, that when this train started there would be a jerk, and he should have acted accordingly. The defendant cannot be held liable, if the motion of the train was not violent or unusual. If the jerk was no more than is incidental to the moving of such a train, there was no negligence. *Central Rld. Co. v. Sims,* 7 S. E. Rep. 176.

By voluntarily climbing upon the freight car when he had no duty to perform there, and when a safe place was provided for him on the caboose, he brought himself clearly within the rule stated in the case of *U. P. Rly. Co v. Estes,* 37 Kas. 715; and by carelessly standing on a loose tie in a dangerous place, without bracing himself in some way, he brought himself within that general rule which requires all adults of sound mind to exercise a reasonable degree of care for their own safety.

The demurrer should have been sustained, for two reasons: First, because plaintiff failed to prove the negligence alleged in her petition; and, second, because she did prove contributory negligence on the part of the deceased. In regard to the first proposition, we call the court's attention to the case of *Wisner v. Bias,* 43 Kas. 458. The rule laid down in that case is as follows:

"Where the evidence of the plaintiff does not support the allegations in her petition, and a demurrer is presented to such evidence by the defendant, such demurrer should be sustained; and, if overruled, is error."

In the case of *Brown v. Railroad Co.,* 31 Kas. 1, the court holds, that unless plaintiff introduces some testimony to prove every material fact of his case, a demurrer should be sustained.

The material fact to be proved in this case was the sudden starting of the train with an unusual jerk. On the proposition that plaintiff's testimony showed contributory negligence on the part of the deceased, we call the court's attention to the case of *U. P. Rly. Co. v. Adams*, 33 Kas. 427. The rule stated in that case is as follows:

"Where an action is brought to recover for a personal injury, and the plaintiff's testimony shows that his own negligence contributed directly to the injury, he has failed to make out a *prima facie* right to recover, and a demurrer interposed to his evidence should be sustained."

Certain of the findings were against the evidence.

The motion for judgment should have been sustained. By the eighteenth instruction, the jury were told that plaintiff could not recover unless the train was suddenly started, with a violent or unusual jerk or motion, without giving any signal or warning. The jury had failed to find the very fact the court told them they must find to entitle the plaintiff to recover. It does not matter whether the eighteenth instruction was good law or not; it was the law of this case, and the jury should have followed it. By their general verdict they disobeyed the direction of the court, for they found there was no unusual jerk, and, by overruling the motion for judgment, the court went back on its own law. This precise point was passed upon by this court in the case of the *U. P. Rly. Co. v. Hutchinson*, 39 Kas. 485; see the same case on rehearing, 40 id. 51. See, also, *U. P. Rly. Co. v. Estes*, 37 Kas. 715; *Kresanowski v. N. P. Rld. Co.*, 18 Fed. Rep. 229; *Railroad Co. v. Jones*, 95 U. S. 439; *Tuttle v. Electric Rly. Co.*, 122 id. 189; *Cunningham v. C. M. & St. P. Rld. Co.*, 17 Fed. Rep. 882; *Railroad Co. v. Roy*, 5 Brad. 82; *Lathrop v. Fitchburg Rld. Co.*, 41 Am. & Eng. Rld. Cases (Mass.), 327; *L. & N. Rld. Co. v. Orr*, 91 Ala. 554; 8 So. Rep. 360; *Railroad Co. v. Holborn*, 84 Ala. 137; 4 So. Rep. 146; *Warden v. L. & N. Rld. Co.*, 10 id. 276; *Martin v. B. & O. Rld. Co.*, 41 Fed. Rep. 125; *Judkins v. Railroad Co.*, 41 Atl. Rep. 735; *Dan-*

*dic v. So. Pac. Rld. Co.,* 7 So. Rep. 792; *Railroad Co. v. Lindley,* 42 Kas. 714.

The motion for a new trial should have been sustained. The eighth instruction requested by defendant stated the law applicable to the facts in this case, and should have been given. By that instruction, defendant requested the court to charge the jury concerning the relative weight of negative and positive testimony. It will be remembered in this case that plaintiff's witnesses testified they did not hear the bell ring; but none of them were positive that it was not rung just before the train started. On the other hand, the engineer and fireman both say the bell was rung by the latter just before the train started. These two men were the only ones whose business it was to ring the bell, and the only persons who were in a position to be sure that it was done. The positive testimony given by them was entitled to greater weight than the negative testimony given by plaintiff's witnesses. The court refused to give the instructions asked by defendant, and there is nothing in the general charge of the court on this particular point. The rule has been stated by this court in *K. C. Ft. S. & G. Rld. Co. v. Lane,* 33 Kas. 702. See, also, *Mo. Pac. Rly. Co. Pierce,* 39 Kas. 391.

*Lafferty & Sternberg,* for defendant in error:

The failure of plaintiff in error to ring a bell or give the usual signal or warning of the starting of the train is *prima facie* evidence of negligence. *A. T. & S. F. Rld. Co. v. McCandliss,* 33 Kas. 372.

There was nothing in the acts of Geary which is negligence *per se.* It is a question for the jury. *A. T. & S. F. Rld. Co. v. McCandliss,* 33 Kas. 366, *et seq.*

Neither is a plaintiff imputable with contributory negligence in not anticipating that the defendant would act negligently in a given particular, and in not providing against the consequences of such anticipated negligence. 2 Thomp. Neg., p. 1172, note 18.

But if it is customary for a railroad brakeman to ride on

the engine, and sometimes necessary for him to be there, it is not negligence *per se*, and is a question for the jury. 2 Thomp. Neg., p. 1213. Nor is it negligence *per se* for an employé to ride in a baggage car on his way to his work.

The facts in *U. P. Rly. Co. v. Estes*, 37 Kas. 715, cited by plaintiff in error, are not at all parallel with the facts in this case.

The case of *Wisner v. Bias*, 43 Kas. 458, is not at all in point, under the facts in this case. It is settled law in this state that contributory negligence is a defense; and unless the plaintiff's evidence shows clearly, satisfactorily and unquestionably contributory negligence on the part of Geary, the case is one for the jury. *K. P. Rly. Co. v. Pointer*, 14 Kas. 38, 50; *St. L. & S. F. Rly. Co. v. Weaver*, 35 id. 423. There was no error in overruling the demurrer to the evidence.

Plaintiff in error asserts that the answers of the jury to certain of the special findings are against the evidence. We call the court's attention to the pages of the record which warrant these findings.

The testimony for defendant in error did not warrant the giving of defendant's eighth instruction, regarding the ringing of the bell and positive testimony. There was positive testimony on part of the plaintiff below that the bell was not rung. See *Railroad Co. v. Lane*, 33 Kas. 706; *K. P. Rly. Co. v. Richardson*, 25 id. 405.

The failure to ring a bell before starting is *prima facie* negligence. *A. T. & S. F. Rld. Co. v. McCandliss*, 37 Kas. 372. Contributory negligence is a defense. *Rapid Transit Rly. Co. v. Fox*, 41 Kas. 715; *K. C. Ft. S. & G. Rld. Co. v. Kier*, 41 id. 662.

The opinion of the court was delivered by ·

HORTON, C. J.: The contention of the railroad company is, that the demurrer to the evidence introduced by the plaintiff below should have been sustained, first, because plaintiff failed to prove the negligence alleged in her petition; and, second,

because she did prove contributory negligence on the part of the deceased. It was not shown there was any "violent or unusual jerk" in the starting of the train, or that Geary had read the rules concerning the signals in the starting of a train.

While the jury did not find that there was any "violent and unusual jerk" in the starting of the train, the record is full of evidence that there was a jerk, more or less, on the rear cars of the train when it started. Rabas, the foreman, testified:

"Ques. Now, describe to the jury the character of the start that train made at the time Geary fell. Ans. It just started. As soon as the train started down the grade, it made a jerk toward the east, and Geary made a great effort to hold himself on his feet, but as soon as it made a second jerk downhill, he went between the cars headforemost. It did not take hardly a second; then I heard a yell, and the conductor made motion to the engineer to stop, and they stopped right away. The leg left on the track was found right behind the caboose, and the train did not go any distance before they stopped.

"Q. At what time did Geary halloo? A. As he was falling down.

"Q. Did you hear him halloo more than once? A. No, sir.

"Q. What kind of a halloo was that—loud or not? A. Loud."

It was in evidence that Geary was an experienced track repairer; had worked for a long time on the road; that he was a good section hand, and knew his duty. There was also evidence tending to show that signals were required to be given before a train starts, and that a signal should have been given for starting the train from which Geary was thrown after the conductor motioned with his hand for the engineer to go ahead with the train. Delaney, the front brakeman, testified:

"Ques. Did you see the conductor give a signal to go ahead? Ans. I did.

"Q. Where was he at the time, and what kind of a signal did he give? A. I think he was in the side door of the caboose; and gave the usual go-ahead signal—the raising of the hand.

"Q. Could you see the engine at that time? A. Part of it.

"Q. What part? A. Saw the cab and stack.

"Q. What other signal was given, if any, before the train started at that time? A. I do n't remember of any other.

"Q. How long did the train remain at a full stop—at what time? A. About one minute, to the best of my judgment and recollection.

"Q. In starting freight trains, upon which you were employed by the defendant company, was it customary to start the train before any signal from the engine? A. It was customary to ring the bell, and some cases the whistle was sounded.

"Q. If the engine bell had been rung at this time, was there anything to prevent you hearing it? A. I do n't know of anything that would prevent me hearing it."

Heshion, the rear brakeman, testified:

"Ques. In what manner did the accident occur that caused his death at the time stated? Ans. The train stopped there to pick up the section men, and Geary and the other men got on the train, and Geary fell between the cars and was run over.

"Q. As the train approached the section men on that occasion, did you set the rear brake before the train came to a stop? A. Yes.

"Q. Was there a hand brake for your use in the cupola of said caboose? A. Yes.

"Q. From the position you occupied in said caboose, could you see the section men getting on the train? A. Could not see them in the act of stepping on the steps of the caboose; I saw them coming toward the caboose.

"Q. State if you know what part of the train Geary got upon. A. Geary got on the southwest corner of the rear box car, went up the ladder and stepped over on to a flat car that was loaded with ties. This flat car was the first or second from the caboose.

"Q. Did you see Geary after he was on the car of ties? A. Yes, sir.

"Q. In what position was Geary when you last saw him on that flat car? A. He just stepped across onto the flat car, and was leaning against the box car.

"Q. At that time was the train in motion or standing still? A. Standing still. —

"Q. Did you see Geary fall? A. I did not.

"Q. Did he fall between the box car and the car load of ties which you have mentioned? A. To the best of my knowledge he did.

"Q. Did you receive any signal from the engine, either by whistle or the ringing of the bell, that the train was about to start? A. I did not hear any.

"Q. At the time the train started, was your brake still set? A. It was.

"What, if anything, did you do when the train started? A. I released the brake in the cupola.

"How soon after the train started did you learn that an accident had occurred? A. I learned in a very short time that something had happened, but it was some time before I knew what it was.

"Q. In what manner did you learn that something had happened? A. By seeing head brakeman giving violent stop signals.

"Q. What, if anything, did you hear? A. I heard a human voice about the same time as of some one in misery.

"Q. Was the tone of the voice you heard loud or medium? A. It was loud.

"Q. Did you set your brake and bring the train to a stop again? A. Yes, I did."

From this and other evidence introduced about the ordinary use of signals, and the long experience of Geary in railroad service, the inferences are that he had knowledge of how trains were handled and operated on the road on which he was working. If there was no "violent or unusual jerk" in the starting of the train, yet, if on account of the omission to ring the bell, or sound the whistle, and a jerk of the train in starting, Geary was thrown from the car without fault on his part, the material allegations of the petition as to negligence were sufficiently proved. There was evidence to sustain the following findings:

"Ques. If the engine bell had been rung for 10 seconds before starting the train, could Geary have heard it? Ans. Yes.

"Q. Did the engineer or fireman of defendant's engine ring the bell before starting the train? A. No."

In support of the alleged contributory negligence, it is

urged that Geary, by voluntarily climbing upon the freight car, when he had no duty to perform there, and when a safe place was provided for him in the caboose, brought himself clearly within the rule stated in the case of the *U. P. Rly. Co. v. Estes*, 37 Kas. 715; and by carelessly standing on a loose tie in a dangerous place, without bracing himself in some way, he brought himself within that general rule which requires all persons of sound mind to exercise a reasonable degree of care for their own safety. It appeared from the evidence that, after the freight train stopped, it was under the direction of Rabas, the foreman in charge of the repairing of the track of the railroad. He testified "that before the conductor gave the signal for the train to start, he saw that Geary was standing on the car of ties;" and the conductor testified:

"Ques. Was it a proper place for Geary on that occasion? Ans. I can't say whether it was a proper place or not.

"Q. Did you consider his position a dangerous one? A. I did not, at the time."

The foreman also testified that "there was nothing to get on that train for except to unload ties; that when told to go back, the men knew there was something to unload, and ties were needed at the place the train stopped; that it was the custom for the men to ride on the load of ties; that Geary was a good section hand and knew his duty; that the ties were back in the train toward the caboose." To the question, "Why did the other men get on the caboose?" Rabas said, "I do n't know."

Mike Hines, a witness for the railroad company, testified that

"The workingmen could pick any place to ride; that the workingmen has not time to pick out best places to ride upon; and that he had ridden on a car of ties several times."

It also appeared from the evidence that after Geary fell from the car the caboose was left, and the foreman and one of the section men rode about a mile and a half on the car of ties and unloaded them; that after the conductor signaled.

with his hand for the train to go ahead the train started, without the whistle sounding or the bell ringing. The conductor testified about the signal as follows:

"Ques. In what manner did you signal the engineer, and what time was required to make that signal? Ans. I signaled him with the usual signal of the hand, which probably requires two or three seconds.

"Q. What is the usual signal you speak of? A. By raising the hand straight up and moving it.

"Q. In what manner does the engineer recognize your signal? A. He usually recognizes it by the ringing of the bell and the starting of the train.

"Q. Are those two recognitions simultaneous? A. There is usually a short intermission.

"Q. What intermission, if any, was there on the day at the time in question? A. As I stated before, I do n't remember as to whether the bell rung."

It must be recollected that McGuire and Geary were on the south side of the track, and that, as the train passed Geary and McGuire, the engineer called to McGuire, "Harry, get on the train; there is a carload of ties to be distributed;" and that Delaney, the head brakeman, as he passed Geary and McGuire, told them "We have a car of ties to unload?" that the foreman did not direct Geary to get into the caboose, and, for aught that appears, Geary might have supposed that it was necessary for him to get upon the car loaded with ties, for the purpose of unloading them. Therefore, we cannot say in this case, upon all the evidence, as a matter of law, as in the Estes case, that Geary voluntarily placed himself in a dangerous position unnecessarily, when there was another place that was safer that he could have chosen, and that he had time to exercise his judgment thereon. The negligence alleged in the petition, and the contributory negligence alleged in the answer, were matters for the determination of the jury upon the conflicting evidence. Upon sufficient evidence, the jury made the following, among other special findings:

1. Employe, killed—contributory negligence—question for jury.

2. Conflicting evidence—findings.

"Ques. Did Geary know, at the time he got on the train, that there was a car load of ties to unload? Ans. Yes.

"Q. Did Geary know, at the time he got onto the train, where the car load of ties was to be unloaded? A. No.

"Q. For what purpose did Geary get on the car load of ties? A. To be ready to assist in unloading the ties?

"Q. Did not the conductor see Geary on the car of ties about the time he gave his signal to the engineer to start the train? A. Yes.

"Q. Was Geary's position on the car load of ties, at the time the conductor gave the signal to the engineer, a dangerous one, if the train had been properly handled and operated? A. No.

"Q. Was Geary accustomed to riding on cars loaded with ties and other material for repairing the track? A. Yes.

"Q. Was there a custom on defendant's railroad for section men, when taken up by freight train for the purpose of going a short distance to perform their work, of riding on any convenient car? A. Yes."

It is further contended, that the trial court erred in not giving the following instruction:

"In regard to the question whether the bell was rung upon the locomotive before the start or not, the jury are instructed that positive evidence of witnesses in a position to know they heard the bell ring, or that they rang it, is of greater weight than the negative evidence of persons at a distance from the locomotive, that they did not hear the bell."

The case of *Railway Co. v. Pierce*, 39 Kas. 391, is cited as decisive. It is conceded that the locomotive whistle was not sounded, but the engineer and fireman testified that the bell was rung just before the train started. This case comes within the decision of *Railroad Co. v. Lane*, 33 Kas. 702. In that case it was observed that,

"While the request, as a general statement of the rule of evidence, is correct, we do not regard its refusal as error. As presented, it ignored all modifying circumstances, and assumed that no positive testimony was offered by the plaintiff that no signal was given. The testimony of one who was in a position to hear, and who was giving special attention to the sounding of the whistle, that it was not sounded, while nega-

tive in form, is a positive statement of fact; and where the witnesses had equal opportunity to hear the whistle, and are equally credible, it is generally of as much value as the testimony of one who states that it was sounded."

The conductor, who gave the motion with his hand to the engineer for the train to start, "could not remember that the bell rung." Heshion, the rear brakeman, whose duty it was to set and take the brake off, "did not hear any signal" as the train was about to start. Delaney, the front brakeman, "did not hear any bell." Jesse Merrill, who was in a field not far away, and whose attention was called to the omission of the ringing of the bell, testified "that no bell was rung." William Merrill, who had worked on the road as a section hand for five or six years, and who was with Jesse Merrill, testified "that he did not hear the bell ring." The train started without the brake being taken off, which ought not to have happened if the signal to start had been given. In the Pierce case, *supra*, the persons who testified that they did not hear the whistle had no connection with the operation of the train, and were not upon the train. In this case, three railroad employés, including the conductor, the head and the rear brakemen, all gave testimony against any signal having been given. The refusal to give the instruction, under these circumstances, was not prejudicial.

Other instructions are complained of, but it appears from the record that the trial court gave the following:

"If you shall find and believe from the evidence that Geary knew, or that he had a right to suppose from custom and duty and usual manner of doing the kind of work he was about to do, that it was not in the line of his duty to get upon the car at the time and place where the injury occurred, and if he knew, or had a right to know, that the caboose was provided for him and the other section men to ride upon at the time and place where the injury occurred, and that it was a safer place for him to ride upon than the car upon which the injury occurred, then it was his duty to get upon the caboose; and if he, under such circumstances and facts, chose to ride upon the car upon which the injury occurred, he assumed the risk of riding in that position. If, in the discharge of a dangerous

duty, an employé voluntarily places himself in a dangerous position unnecessarily, when there are other and safer places which he could have chosen, he assumes the risk of riding in such a dangerous position. Railroad companies are not insurers of the safety of the lives of their employés, and are not liable to them for injuries received, unless the railroad company is guilty of negligence causing the injury, and not then, if the employé is guilty of negligence materially contributing to his injury. If you should find and believe from the evidence that the deceased himself so far contributed to his own injury by his own negligence, or want of ordinary care and caution, that but for such negligence or want of ordinary care and caution on his part the injury would not have happened, plaintiff cannot recover in this action, and you should find for the defendant."

In view of these instructions, the refusal to give others upon similar matters was not error.

We have examined the special findings of the jury, but do not find they justify the severe criticisms made upon them.

We have, also, examined the other alleged errors discussed in the elaborate briefs, but do not perceive anything sufficient to demand a reversal of the judgment.

3. Evidence sustains judgment.

The judgment will be affirmed.

All the Justices concurring.